## SIEG v. GREENE.

**(Circuit Court of Appeals, Eighth Circuit. July 24, 1915.
Rehearing Denied October 5, 1915.) ***

### No. 4348.

1. HOMESTEAD ⬡⟿84—PROPERTY CONSTITUTING—UNDIVIDED INTEREST.
Under the Iowa statutes and decisions, the homestead claim attaches to the undivided interest of a tenant in common.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 121, 122; Dec. Dig. ⬡⟿84.]

2. FRAUDULENT CONVEYANCES ⬡⟿52—CONVEYANCE OF HOMESTEAD.
Under the Iowa statutes and decisions, a voluntary conveyance of the homestead is not fraudulent as to creditors, and the grantor need not receive full value, as his creditors cannot take it and have no concern about what he gets.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 118–127; Dec. Dig. ⬡⟿52.]

3. BANKRUPTCY ⬡⟿184—FRAUDULENT CONVEYANCES—FORCE OF STATE LAWS.
Under Bankr. Act July 1, 1898, c. 541, § 6, 30 Stat. 548 (Comp. St. 1913, § 9590), providing that that act shall not affect the allowance to bankrupts of exemptions prescribed by the state laws, state statutes and decisions control in determining whether a conveyance by a bankrupt of land in which he had a homestead interest was fraudulent as to creditors.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. ⬡⟿184.]

4. HOMESTEAD ⬡⟿84—PROPERTY CONSTITUTING HOMESTEAD—EXTENT.
The Iowa statutes (Code 1897 and Code Supp. 1907, §§ 2972–2978) provide that the homestead embraces the house used as a home by the owner, that if he has two or more houses he may select which he will retain, and that if not within a city or town plat it must not contain more than 40 acres or embrace more than one dwelling house. S. owned an undivided half interest in about 97 acres of land, 10 acres of which was within the corporate limits of a municipality, but had not been platted. There were two houses on the land, one of which S. occupied with his family, and also a brick manufacturing plant occupying about 2 acres; the rest of the land being farm land. *Held*, that the homestead right was confined to the undivided half interest in 80 acres, including the dwelling house occupied by S., and excluding the brick plant and appurtenances and the other dwelling house.

[Ed. Note.—For other cases, see Homestead, Cent. Dig. §§ 121, 122; Dec. Dig. ⬡⟿84.]

5. BANKRUPTCY ⬡⟿177—VOIDABLE PREFERENCES—DELAY IN RECORDING DEED.
A conveyance of land in which a bankrupt had a homestead interest was voidable as to the excess of the land over the homestead right, where the deed was not recorded until within four months before bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. ⬡⟿177.]

6. BANKRUPTCY ⬡⟿165—"VOIDABLE PREFERENCE"—TRANSFERS CONSTITUTING.
A partnership manufacturing brick, being insolvent, applied for assistance to continue operations to S., who was formerly a partner, owned an undivided half interest in the brick plant, and had theretofore purchased the other half interest. S., knowing of the firm's condition, advanced it money under an agreement, made in good faith, that the firm would manufacture brick for him to the value of the amount advanced, to be taken by him in the yard as soon as they were burned. The laborers in the yard were paid with S.'s money, and they understood the

bricks were being made for him. More than 30 days, but within 4 months, prior to bankruptcy, S. took possession of the plant and the brick already manufactured. *Held*, that the transaction was not a voidable preference, within Bankr. Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (Comp. St. 1913, § 9644), making transfers by an insolvent within 4 months before bankruptcy, enabling a creditor to obtain a greater percentage of his debt than other creditors, preferential, and section 60b (section 9644), making such preferences voidable if the transferee had reasonable cause to believe that the transfer would effect a preference, since S. took possession in virtue of his right, created by the contract at the time it was made, and in satisfaction of an equitable lien.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. ⊜⟶165.

For other definitions, see Words and Phrases, First and Second Series. Voidable Preference.]

7. LIENS ⊜⟶7—EQUITABLE LIENS.

Advancements made on the faith of certain property may give rise to an equitable lien, and such a lien may attach to property to be created, and not in being at the time of the agreement, and does not depend upon possession, but may exist by implication growing out of facts and circumstances creating the equitable right.

[Ed. Note.—For other cases, see Liens, Cent. Dig. §§ 26–28; Dec. Dig. ⊜⟶7.]

8. BANKRUPTCY ⊜⟶186—VOIDABLE PREFERENCES—IMPROVEMENTS.

Where one to whom a brick plant was transferred by a bankrupt within four months before bankruptcy made large expenditures in putting in new machinery and otherwise improving the plant, any property thus added was no part of the estate in bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 285, 319; Dec. Dig. ⊜⟶186.]

Appeal from the District Court of the United States for the Southern District of Iowa; Smith McPherson, Judge.

Suit by Merritt Greene, trustee in bankruptcy of Size & Carpenter, against John A. Sieg. From a decree in favor of plaintiff, defendant appeals. Reversed and remanded, with directions.

For many years prior to 1903, John A. Sieg and William A. Size manufactured and sold brick at Marshalltown, Iowa, as co-partners in the name of Sieg & Size. Each of them owned an undivided half interest in a tract of land adjoining the town, ten acres of which was within the corporate limits, but had not been platted as town lots. The manufacturing plant was on the tract, from which material for making brick was obtained. There were also two residences, one of which was occupied by Size and his family as their home; and Sieg, who was a bachelor, lived with them, although he was away much of the time. They farmed the land, except some two acres occupied by the brick plant. Formerly the plant was in the northeast part of the tract, but was later moved south, near a railroad which crosses it.

In the latter part of 1902, Sieg withdrew from the firm and made an agreement with Charles E. Carpenter, who was the son-in-law of William A. Size, by which he agreed to sell and Carpenter agreed to buy Sieg's undivided half interest in all of the tools, machinery and appliances on and used with the yard in the manufacture of brick for the sum of $4,000, to be paid in stipulated installments; and also leased to Carpenter his undivided half interest in the brickyard and the house on the tract not occupied by the family of William A. Size for a term expiring January 1, 1908, at a yearly rental of $300, and also gave to Carpenter an option to buy the premises leased, and the right to extend the lease for five years after January 1, 1908, at the same rental. Carpenter did not keep his contract to purchase, nor pay the rentals un-

---

⊜⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

der the lease. There is no evidence to show an extension of the lease. Soon after the making of the contract and lease the copartnership of Size & Carpenter was formed for the purpose of continuing the manufacture and sale of brick, which the new firm proceeded to carry on. The record here leads to the conclusion that the new firm was composed of George S. Size, a son of William A., and Charles E. Carpenter, though the District Court on petition of creditors in bankruptcy adjudged that the firm was composed of William A. and George S. Size and Carpenter; however, that is immaterial in this proceeding.

About August 1, 1911, creditors filed their petition against the firm of Size & Carpenter and obtained an adjudication that the firm and its individual members, including William A. Size, were bankrupts as charged, and the appellee was duly appointed trustee of their estates.

On July 15, 1910, William A. Size and wife conveyed by warranty deed all of their undivided half interest in the tract of land to John A. Sieg, in consideration of his surrendering to the wife of Size the notes of William A. Size payable to Sieg, which with interest then amounted to something over $5,000. Sieg did not place this deed of record until June 29, 1911. On that day Carpenter turned over to Sieg and he took possession of the brickyard. The new firm ceased operations at that time.

In the summer of 1910, the firm of Size & Carpenter was without funds to continue the brick business. They were then insolvent and applied to Sieg for assistance to continue operation of the plant, and on July 22, 1910, he let the firm have $1,000 (by check), and a little later $2,000 more. He knew the firm was in a failing condition and was not willing to put up the money as a simple loan. So when he turned over the check he had an agreement with the firm by which he was to furnish the $3,000 for the manufacture of 600,000 brick which the firm was to make for him at that price ($5.00 per 1,000), and he was to take them on the yard as soon as they were burned. Size & Carpenter had no funds to meet the necessary expenses in the manufacture and Sieg knew it and for that reason he made the advancement under the agreement that the brick were to be his. The brick were manufactured as agreed, but Sieg got only about 550,000, some 200,000 of which were still green in the kilns when he took possession on June 29, 1911, and which were later burned at his additional expense. He got all of them within four months prior to the day bankruptcy petition was filed.

Sieg's money paid the laborers on the yard. They understood the brick were being made for him. He testified that the machinery and all the property at the plant had been his since 1908, when he bought out the half interest of W. A. Size in the brick plant. Carpenter had never kept up his payments, either under the lease or contract to purchase Sieg's half of the plant.

This suit, brought by the trustee against Sieg, was double in purpose, that is, to recover (1) the undivided half interest of William A. Size in the land which he conveyed to Sieg by deed of date July 15, 1910, and (2) the value of the brick received by Sieg from the bankrupts; and the bill charged that both transfers were voidable preferences and also fraudulent (Bankruptcy Act July 1, 1898, c. 541, §§ 60 and 67, 30 Stat. 562, 564 [Comp. St. 1913, §§ 9644, 9651]).

The trial court granted all that was asked. It entered a decree (1) canceling the deed from Size and wife to Sieg, (2) ordering that Sieg account to the trustee for rents after July 22, 1910 (date deed was acknowledged), and (3) that the trustee recover of Sieg $2,500, the reasonable value of 500,000 brick turned over to him by the bankrupts, and that Sieg pay the costs.

C. H. Van Law, of Marshalltown, Iowa, for appellant.

C. H. E. Boardman, of Marshalltown, Iowa, for appellee.

Before SANBORN and CARLAND, Circuit Judges, and LEWIS, District Judge.

LEWIS, District Judge (after stating the facts as above).    [1-4]
1. One of the defenses was that the deed from Size to Sieg could

not be avoided on either ground stated in the bill or for any other reason, because the property conveyed was at the time of its conveyance the homestead of Size and his family who at that time and for many years theretofore had continuously resided on it.

The Iowa statute on the subject may be epitomized: Exemption of the homestead from judicial sale; requirement that husband and wife join in the conveyance to render it valid; embraces the house used as a home by the owner, and if he has two or more houses thus used he may select which he will retain, and if not within a city or town plat it must not contain in the aggregate more than forty acres, and must not embrace more than one dwelling house. Code of Iowa 1897 and Supplement thereto 1907, §§ 2972–2978. Under this statute the homestead claim attaches to the undivided interest of a tenant in common. Thorn v. Thorn, 14 Iowa, 49, 81 Am. Dec. 451; Bolton v. Oberne, 79 Iowa, 278, 44 N. W. 547. A voluntary conveyance of the homestead is not fraudulent as to creditors. Delashmut v. Trau, 44 Iowa, 613; Officer v. Evans, 48 Iowa, 557–560; Foreman v. Bank, 128 Iowa, 661, 105 N. W. 164; Bank v. Glick, 134 Iowa, 323, 111 N. W. 970; Dettmer v. Behrens, 106 Iowa, 585, 76 N. W. 853, 68 Am. St. Rep. 326; Wheeler, etc., Co. v. Bjelland, 97 Iowa, 637, 66 N. W. 885; Green v. Root (D. C.) 62 Fed. 191. The grantor in such a case need not receive full value. His creditors cannot take it, and have no concern about what he gets. Griffin v. Sheley, 55 Iowa, 513, 8 N. W. 343; Aultman v. Heiney, 59 Iowa, 654, 13 N. W. 856. The state statute and decisions control here. Bank v. Glass, 79 Fed. 706, 25 C. C. A. 151; Bankruptcy Act, § 6; Vitzthum v. Large (D. C.) 162 Fed. 685. The trustee cannot recover it. It was not an asset of the bankrupt estate, was beyond the reach of creditors and likewise of the trustee who represents them. But the right did not attach to that part of the tract used as a brickyard and its appurtenances. That was not a part of the farm, nor appurtenant thereto, and was not used as a part of the home. Mouriquand v. Hart, 22 Kan. 594, 31 Am. Rep. 200. At the time of the conveyance the entire tract contained 97.68 acres. The claim to the homestead right was confined to the undivided half interest in eighty acres. The other dwelling house and its appurtenant grounds occupied by Carpenter and family could not be included in the homestead of Size. The homestead exemption as claimed should have been sustained, and set off in eighty acres of the farm lands including the dwelling occupied by Size and family, and excluding the brick plant and yard, together with needed appurtenant ground, also the Carpenter dwelling and appurtenances, and also such additional acreage, if necessary, to bring the exemption within the limited area.

[5] Registration and record of the deed was required and this was not done until within the prohibited four months period; it was therefore voidable as to the excess over the homestead right. It follows that Sieg's liability for rent would also be confined to what he received on one-half of the excess.

[6, 7] 2. The issue as to Sieg's claimed liability for the value of the brick turned over to him within the four months period by the

bankrupts, is more difficult. In its consideration we confine the inquiry to whether that transaction operated to effect a preference rendered voidable by section 60a and b of the Act; and this, because the evidence entirely fails as a sufficient basis on which any claim that the transaction was in fact fraudulent, as charged in the bill, could be rested, and additionally there is no finding of fact that way by the trial court which might relieve us in part from a wholly independent consideration and conclusion in the matter. Thus coming to the question: Was it a preferential transfer voidable under the act by the trustee?, we first note our conclusion that nothing appears to cause us to doubt that the agreement covering the manufacture and advanced payments therefor was in entire good faith—we so accept it. It was complete in its terms, nothing was left open for further negotiation and settlement by the parties. It was final and binding on them, and each could have enforced performance, or obtained damages for its breach. The property which Sieg received was produced with the money which he advanced under the agreement, and when he received it no creditor of the bankrupts had acquired any right in it or against it under local law. He took possession of it not as a purchaser of that date, but in virtue of his right which was created by the contract at the time it was made with the bankrupts, to have the property subjected to the payment of his claim. He took over a product which his money had wrought, and in doing so satisfied an equitable lien, which he had long before acquired under the contract and the facts and circumstances surrounding the transaction. Advancements made on the faith of certain property may give rise to the lien. Howard v. Delgado, 121 Fed. 26, 57 C. C. A. 270; Hauselt v. Harrison, 105 U. S. 401, 26 L. Ed. 1075. It may attach to property to be created and not in esse at the time of the agreement. Mitchell v. Winslow, 2 Story, 630, Fed. Cas. No. 9,673; Wright v. Bircher, 72 Mo. 179, 185, 37 Am. Rep. 433. It does not depend upon possession, The Menominie (D. C.) 36 Fed. 199. It may exist by implication growing out of facts and circumstances which create the equitable right. Soc. of Shakers v. Watson, 68 Fed. 730, 739, 15 C. C. A. 632.

The principle under consideration and the facts necessary to constitute a right to an equitable lien are fully considered and aptly illustrated by this court in A., T. & S. F. Ry. Co. v. Hurley, 153 Fed. 503, 82 C. C. A. 453. The railway company advanced money for coal to be delivered in the future. The coal company was put into bankruptcy and did not deliver the coal for which advancements were made. The railway company asked for an order directing the trustee to return to it the money so advanced as a preferential claim. This court, speaking through Judge Adams, said (153 Fed. 507, 82 C. C. A. 457):

"The money paid in advance entitled the railway company to an amount of coal which the money so advanced would pay for according to the terms of the original contract. We think the inevitable meaning of the new arrangement, interpreted in the light of the conditions surrounding the parties and as necessarily intended by them, was to set apart a sufficient amount of coal after it should be mined as security for the payment of advances made. This

result is not expressed in the conventional form of a mortgage or pledge, but the method of producing it was devised for the purpose of acquiring the needed money by the coal company and of furnishing security for its repayment. If the parties intended the arrangement to be one for borrowing and securing the repayment of money, we ought, as between them, to so regard it and to treat it as creating an equitable charge or lien, however inartificially it may have been expressed," and again (153 Fed. 509, 82 C. C. A. 459): "In the light of these authorities we have no hesitation in holding that the equitable charge created by the parties before the bankruptcy of the coal company should be enforced against the estate in the hands of its trustees."

This ruling was affirmed in 213 U. S. 126, 29 Sup. Ct. 466, 53 L. Ed. 729.

In Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577, the rights of a mortgagee to after-acquired chattel property which, according to local law, did not come under the lien of the mortgage until possession should be taken, were involved. Possession was taken within the four months' period. In sustaining the right of the mortgagee to the property it was said (196 U. S. 523, 25 Sup. Ct. 309 [49 L. Ed. 577]):

"It can scarcely be said that the enforcement of a lien by the taking possession, with the consent of the mortgagor, of after-acquired property covered by a valid mortgage is a conveyance or transfer within the Bankrupt Act."

Again (196 U. S. 524, 25 Sup. Ct. 309, 49 L. Ed. 577):

"The principle that the taking possession may sometimes be held to relate back to the time when the right so to do was created, is recognized in the above case. Sabin v. Camp [(C. C.) 98 Fed. 974]. So in this case, although there was no actual existing lien upon this after-acquired property until the taking possession, yet there was a positive agreement, as contained in the mortgage and existing of record, under which the inchoate lien might be asserted and enforced, and when enforced by the taking of possession, that possession under the facts of this case, related back to the time of the execution of the mortgage of April, 1891, as it was only by virtue of that mortgage that possession could be taken. * * * Although this after-acquired property was subject to the lien of an attaching or an execution creditor, if perfected before the mortgagee took possession under his mortgage, yet if there were no such creditor, the enforcement of the lien by taking possession would be legal, even if within the four months provided in the Act."

The Sabin-Camp Case there quoted and approved, is very much in point. See also Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956; Sexton v. Kessler & Co., 172 Fed. 535, 97 C. C. A. 161, 40 L. R. A. (N. S.) 639; affirmed 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995; In re Bird (D. C.) 180 Fed. 229; M'Donald v. Daskam, 116 Fed. 276, 53 C. C. A. 554; In re Wittenberg Veneer & Panel Co. (D. C.) 108 Fed. 593; Tiffany v. Boatman's Institution, 18 Wall. 375, 388, 21 L. Ed. 868.

There is no evidence that the brick ever came "into the custody of the bankruptcy court" (Bankruptcy Act July 1, 1898, c. 541, § 47, 30 Stat. 557 [Comp. St. 1913, § 9631]), nor that at the time the petition in bankruptcy was filed they could have been transferred by the bankrupts or levied upon as their property (section 70 [section 9654]), but to the contrary, they had all been taken over by Sieg more than thirty days prior thereto. Galbraith v. Bank, 221 Fed. 386, 392, —— C. C. A. ——.

We think the transaction did not operate to effect a preferential transfer voidable by the trustee, and that the court erred in so holding and adjudging that Sieg account to the trustee for the value of the brick.

[8] 3. It appears that Sieg immediately after taking possession of the brick plant in June, 1911, made large expenditures in putting in new machinery and otherwise improving the plant. Of course, any property thus added at the sole expense of Sieg was no part of the estate in bankruptcy.

The decree of the court below is reversed with costs, and the cause remanded with directions to proceed in accordance with the views herein expressed.

It is so ordered.