**CATTLE OWNERS CORPORATION et al., Plaintiffs,**

v.

**David ARKIN et al., Defendants.**

**SWINE OWNERS CORPORATION et al., Plaintiffs,**

v.

**Leo JACOBSON et al., Defendants.**

**Civ. Nos. 5–1323, 5–1324.**

United States District Court
S. D. Iowa,
Central Division.

Feb. 25, 1966.

Philip H. Cless, Des Moines, Iowa, for
plaintiffs and receiver.

Robert E. Mannheimer, John H. Nei-
man, Matthew J. Heartney, Jr., Des
Moines, Iowa, Leslie L. Boomhower,
Mason City, Iowa; Marvin R. Adams,
Des Moines, Iowa; William Pappas,
Mason City, Iowa; Paul F. Ahlers, Ken-
neth H. Haynie, Donald A. Wine, Des
Moines Iowa, Matthew Silverman, New
York City; Harold H. Newcomb, Hiram
S. Hunn, Plainfield, Vt.; D. J. Fair-
grave, Mark W. Putney, John D. Galvin,
John McClintock, Eugene Davis, Des
Moines, Iowa, for defendants.

HANSON, District Judge.

The instant submission involves but
one facet of the issues of two cases as
above indicated, one bearing cause No.
5–1323 and the other bearing cause No.
5–1324. The causes of action have been
consolidated for disposition and, in most
instances in the past, as it relates to the
disposition of the cases, have been con-
sidered together. Both cases in their
present form and by their own denomina-
tion are indicated to be multi-party inter-
pleader actions brought pursuant to Title
28, U.S.C.A. § 1335.

The immediate concern in this sub-
mission is a hearing on a report and
recommendation of a receiver in both
causes of action. Since both cases have
in truth and fact been adjudicated to be
in substance interpleader actions, the re-
ceiver herein, it would seem, could also
be referred to as a stakeholder, and
throughout these proceedings, he will
from time to time be referred to as both.
In any event, it may be of little signifi-

cance what he is called by reason of the dispositions hereinafter to be made.

The historical background can generally be gleaned from the admitted pleadings and Orders of the Court contained within the files of both cases. It has in substance been succinctly described in another portion of the cases heard by the United States Circuit Court of Appeals, Smith v. Sherman, 8 Cir., 349 F.2d 547 at pp. 548 and 549. It is even more detailed in the adjudication of the court in cause No. 5–1323 as is set out in the Order of Judge Stephenson entered as of the 14th day of January, 1963; and further in cause No. 5–1324 by the Order of Judge Stephenson entered on the 15th day of January, 1963. It would thus seem by reason of these Orders that a discussion of the propriety and identification of the parties as they relate to these proceedings would be of little assistance because they are identified in the former adjudications. The record as related to these proceedings, particularly as to appearances and as to actual participation in the trial of the immediate cause, is sufficient so that they will not be plenarily set out herein.

In any event, it does not seem to be challenged by anyone that on or about the year of 1958, under the imaginative process of a high school graduate by the name of Carroll Morris, then 23 years of age, the embryonic Fashion Farm originated. In common parlance, the process was called a cow pool. The local farmers boarded their animals for milking purposes. The idea of such a cow pool appeared rather novel to some and it was apparent that the public by the encouragement of the news media generally viewed the operation as having much more merit than it actually had. It appears that Morris was told that he had a novel idea so many times that he began to believe it himself. It does appear further that he tried to improve the quality of the milk from grade B to grade A and was in some aspects successful. Ultimately, the matter became attractive to financiers of the eastern seaboard, and under the general scheme of events, many millions of dollars worth of animals were purchased in the operation.

For many reasons, which the court will not detail as they are of no significance in the ultimate disposition of the problem at hand, the relationship financially collapsed in the year of 1962. It is what to do with the remaining fruits of the financial debacle that this court has to contend. Division of the fruits of a collapsed financial adventure becomes more difficult in proportion to its expectancy at the time the adventure hatched. The enthusiasm for this type of operation as manifested by Morris was exceeded only by those who had the wherewithal to venture.

No one could ever deny in a study of these transactions that the machinery incidental to the distribution of the property and livestock remaining for those to whom it properly belonged was not exhausted, for, first, it appears that the individuals claiming to be the owners of the property tried in their way, working with Morris, to in some manner amicably get their rightful fruits. This did not seem to work. Fashion Farm, Inc., was from every aspect insofar as its efforts and conduct were concerned controlled by Carroll Morris. The corporation actually on or about August 7, 1962, threw up its management of the livestock and so indicated the same to the owners thereof. In addition thereto, the Swine Improvement Association, an individual proprietorship operated by Carroll Morris and involved in cause No. 5–1324, did likewise. Since liquidation could not take place through Fashion Farm, Inc. or the Swine Improvement Association, it was ultimately decided that liquidation corporations would be formed and they were formed. Cattle Owners Corporation, involved as plaintiff in 5–1323, and Swine Owners Corporation, involved as plaintiff in 5–1324, were formed, and a lawyer by the name of Robert E. Mannheimer appears to have been somewhat instrumental as counsel for these corporations, and one Don O. Jones, then not the receiver in this interpleader action, assumed the management and liquidation

of the cattle and swine involved in the corporations. The process of liquidation by way of the corporations apparently failed on November 23, 1962. Thus it is apparent that this manner of liquidation failed.

Of course, the manager and the owners of the property both by way of cash and livestock had a fund which apparently could not be at that time amicably distributed. Thus the next resort was to the United States Federal Court. Thus is born the case bearing Civil No. 5–1323 which is herein referred to as the Cattle Owners case, and in addition thereto, on that same day, November 23, 1962, the case known as the Swine Owners case bearing No. 5–1324 was filed. These must be considered by reason of the process of adjudication as being interpleader actions in both instances. Thus we have another form for distribution and liquidation of the remains of personal property and cash. It must, however, be remembered also that bankruptcy insofar as Fashion Farm, Inc., was concerned was filed on November 14, 1962, and was in action at the time that these interpleader actions were filed on November 23, 1962. It appears to this court that the Order made on the 15th day of January, 1963, in cause No. 5–1324 and the Order made on the 14th day of January, 1963, in cause No. 5–1323 ultimately adjudicated them to be interpleader actions and do in general invoke the machinery incidental to the distribution of the stake. The court does not observe that there has ever been any appeal from these Orders in 1963. In any event, for the purposes of this decision, the court deems them to be the law of the case.

The next vital step in these proceedings was the filing of a Report and Recommendation by Don O. Jones, the duly appointed, acting and qualified receiver, appointed in connection with the interpleader. It will be remembered that he was also the manager of the liquidating corporations.

A report was filed as of November 8, 1963, said report being filed in both causes of action, and in many respects were in substance identical with the exception as it related to matters of accounting. The gist of this report seemed to indicate that the Receiver was having some difficulty with relation to identification of the animals involved within the respective corporations and that it is apparent he had reached some conclusions that he felt precipitated a trust situation and indicated in his report that he should be appointed as a Trustee rather than a Receiver. On the same date, the court fixed a hearing on these reports. These reports were extensively objected to by a great majority of the individuals involved in the transactions. It does not appear that these reports and recommendations were in any respect ever accepted by anyone. Indeed, in this respect, even the Trustee in Bankruptcy, Mr. John M. Powell, of Fashion Farm in the bankruptcy established as indicated heretofore, filed objections to the reports and recommendations of the Receiver. Subsequent thereto, without going into detail, new counsel for the Receiver was appointed and further and different reports were subsequently filed.

The United States District Court for the Southern District of Iowa, Central Division, on its own motion on July 8, 1964, entered another Order requiring the Receiver to indicate the current status of the liquidation of the cattle and hogs in the two proceedings, also a proposal for reducing the administration expense, and lastly, ordered recommendations from the Receiver as to eventual termination of these proceedings including the distribution of proceeds particularly as these proceedings may be related to the bankruptcy cases. (This Order and all other Orders hereinbefore referred to and hereinafter referred to are incorporated as a part hereof in full and as though fully set out herein. The purpose of referring to these Orders and adjudications is to relate them to the ultimate disposition of the cases.)

Pursuant to the Order of the 8th day of July, 1964, there was filed on August 25, 1964, a report and recommendation of the Receiver in response thereto. In

substance, the recommendations filed as of this date were the same in both causes Nos. 5–1323 and 5–1324. These reports were ordered to come on for hearing and it appears that proper notice was served upon the defendants. Certain of the defendants filed objections. On the other hand, there were certain reports filed concurring with the recommendations of the Receiver, two of which are noteworthy in these proceedings at this particular stage of the history. It will be remembered that on November 14, 1962, in the Northern District of Iowa, a petition in bankruptcy was filed as heretofore indicated and Fashion Farm, Inc. was adjudicated a bankrupt and one John Powell of Clear Lake, Iowa, was the first Receiver and subsequently appointed Trustee. This bankruptcy was subsequently transferred by the District Court of the Northern District of Iowa to the Southern District of Iowa, and Robert E. Mannheimer was therein appointed as Trustee and John Powell released. This was done on or about July 8, 1964. Also, on June 5, 1964, in the Southern District of Iowa, Carroll Morris was adjudicated a bankrupt with John Neiman as Trustee. On September 22, 1964, Robert E. Mannheimer filed a concurrence in the recommendations of the Receiver in cause No. 5–1323 and John Neiman, Trustee, filed a concurrence in the recommendations of the Receiver in cause No. 5–1324.

On Order of the District Court, a pretrial conference came on for submission in both causes of action on the 6th day of October, 1964, before Hon. Roy L. Stephenson, Chief Judge of the Southern District of Iowa. A pretrial Order in both Nos. 5–1323 and 5–1324 was filed October 15, 1964. The Court in said pretrial Orders very carefully and definitely outlined the respective issues to be submitted as they relate to the approval or rejection of the report filed by the Receiver hereinbefore referred to and in this connection, placed the burden of proof upon the Receiver to sustain the same. In addition thereto, the Order extended to certain of the objectors additional rights as it pertained to objections filed by them. Following the pretrial conference, the Receiver filed what has been denominated as Substitute Contentions of Receiver as permitted by the pretrial Order of October 15, 1964. The pleading is as follows, to-wit:

"COMES now Don O. Jones, Receiver in each of the above proceedings, and as permitted in Paragraph 9 of the Court's pretrial order of October 15, 1964, does hereby restate his contentions as contained in Paragraph 5 of said pre-trial order as follows:

First: That by reason of improper descriptions, Inadequate descriptions, the lack of recordation or because bills of sale together with investor contracts were intended to create a colorable title only in the investor, title to all animals remained in the Bankrupts.

Second: That if title did so pass by the bills of sale that an analysis of the investor contracts in most instances discloses a conditional sale or sale back to the Bankrupts with or without the aid of recordation.

Third: That if title did pass to the investors by bill of sale, that by reason of confusion of goods however caused, the rights of the Bankrupts to offspring, milk receipts and animals not the subject of investor contracts, animals, title to which did remain in Bankrupts under the above first contention and that passed back to the Bankrupts under the above second contention, created a moiety of property interest in each and every animal in the Bankrupts that have been liquidated by the Receiver.

Fourth: That it was the intention of both the investors and Bankrupts that the investors make investments in cash, returnable in cash with income thereon in cash as is the case in the ownership of any security."

These causes were ultimately assigned to the undersigned Judge on November 10, 1964, to come on for hearing and trial on January 5, 1965. It is this facet of the case that was hereinbefore referred to that here must be ruled upon.

The recommendations of the Receiver in these respective cases now ask the court to in substance transfer all funds to the respective Trustees in Bankruptcy, thus again indicating another type of legal machinery to be utilized for the purpose of distribution of the funds in the hands of the Receiver stakeholder.

The Court will hereinafter make some additional findings to say that the matter came on for trial on the date hereinbefore indicated, appearances were entered, and opening statements were made as indicated in the record. At the conclusion of the opening statements, certain of the objectors made motions requesting the court to reject portions of the Receiver's recommendations. The motions will in most respects insofar as they may require adjudication be disposed of in the decision rendered in this cause.

It should be noted that there is considerable intense feeling on the part of many of the parties to these proceedings that the proceedings here are in substance adversary. The Receiver in his main brief and argument at page 7 in the first paragraph thereof describes the proceedings as follows, to-wit: "The Receiver conceives that the proceeding is essentially a resisted application and recommendation for a method of distribution, supported by the Court's interpleader jurisdiction, and at the same time a plenary examination in this Court sitting in equity of the rights of the Trustees in Bankruptcy to invoke Title 11, Section 11(a) (21) U.S.C.A. Whatever type of proceeding it may be has heretofore been determined and the Court will as a result thereof adhere to the issues raised in the report of the Receiver. Limited to the portion of the interpleader action above indicated, the trial was to the Court without a jury and lasted approximately four weeks. The testimony of thirteen witnesses was heard either by deposition or in person. Implementing this testimony, there was offered approximately 1000 exhibits. The Court at this juncture of the proceeding will briefly examine the testimony of the respective witnesses.

Approximately ten volumes of the transcript of testimony involved herein is devoted to the direct, redirect, cross, and re-cross examination of the witness Carroll Morris. The witness Morris was in no manner hostile or reluctant to completely divulge all transactions in which he was engaged as fully and completely as permitted. He was called by the Receiver and thoroughly examined and re-examined. His testimony related the history of Fashion Farm which has in substance been indicated heretofore both in this Memorandum and in previous Court Memorandums and thus it would be of no particular significance to set the same out again in this proceeding. The Receiver in his brief and argument absolves and so states that Carroll Morris was in no manner guilty of any actual fraud. He does, however, urge that there may have been constructive fraud perpetrated in the cause. Thus, by the Receiver's position and because of no evidence to the contrary, the court must conclude that Carroll Morris in every aspect was acting in good faith in his transactions.

A great proportion of the evidence emanating from the lips of Morris concerned identification, execution of, and foundation for the offer and introduction of documentary evidence. He identified letters, mortgages, bills of sale, books, assignments, and all other types of instruments to indicate the proceedings had in the cattle and hog operations. In each and every instance without exception, he indicated his intent and voluntary execution of the instruments wherein his particular action was involved. In every instance in which there was a sale, transfer, or deed involving the matter of title and ownership, he invariably testified that he conveyed or sold any interest that he might have had and that he retained no title or interest in the property so sold, assigned, conveyed, or transferred. He verified, sustained, and corroborated in every instance the ownership alleged by the objectors to the Receiver's report. He sustained every statement of the objectors as it related to the manner in which livestock were placed

at farmer locations and confirmed the contractual relationship. He testified that he purchased animals for the individuals and that these individuals furnished the money with which to make the purchases, and further made his placements on farms pursuant to the contracts offered and introduced in this record. He testified in substance that he understood and knew the contents of the documents negotiated by or through him. He never indicated at any stage of the proceedings that there were any ambiguities or misunderstandings as to the terms of the contracts negotiated by him. He stated that the animals were placed in the care, custody and possession of farmers who would feed and care for them under the provisions of their contracts. He stated that as a part of their service he sent out checkers to check and see whether the animals were being properly cared for and to aid and assist in appropriate steps for their proper handling. He testified that insofar as these animals were concerned that he tried to maintain a proper identification record as to the true owners of the livestock. He was clear and convincing and without equivocation in his manifestations as they related to the owners of the livestock. He indicated that he aided and assisted and accommodated the purchasers of livestock in loan transactions with banking institutions and loan agencies. There is some indication in the testimony that there were occasions when some confusion was generated with relation to the handling of the records of the two enterprises, namely, Fashion Farm and Swine Improvement. Nevertheless, he steadfastly held to the position that every effort was being made to keep the herds of animals of the purchasers properly identified at their respective locations. There could be no doubt in any one's mind upon hearing and reading his testimony that he was convinced from the beginning that he was handling other people's property, that he did not own it himself, and up to the present time still believes that to be the fact, and that he so intended it to be the fact. His testimony clearly and convincingly establishes that the present property now in the hands of the Receiver clearly belongs to the indicated purchasers involved in these proceedings. Morris contends that he has no property interest left in these respective herds and he, as a bankrupt individually, makes no claim to them. Further review as it relates to his testimony will be of no purpose at this time.

Approximately three volumes of testimony were received from Robert Ingersoll, a certified public accountant with offices located in Mason City and Clear Lake, Iowa. It appears that some time in the year of 1959, he became associated with the accounting affairs of Carroll Morris who was at that time in the process of incorporating Fashion Farm. He became an accountant for the corporation. In general, he set up the books and records of the corporation and of Swine Improvement Association. His testimony involved interpretation of financial statements, financial reports, and general accounting reports, all of which are in evidence properly identified in this cause. It seems to be established that he continued his general work of making tax returns and other types of accounting until about August 1961. It seems that for a while another firm of accountants worked in connection with the enterprises, and that again in the early part of August, perhaps August 3, 1962, he re-entered into the problems confronting the respective enterprises. This was at the request of one of the individuals by the name of Jacobson. It was at this time that the liquidation corporations were coming into existence and Mr. Ingersoll accepted employment and aided and assisted in getting the accounting in proper order. With the exception of some accounting procedures, he states that he found the books and records in substantially the same form as they were in the spring of 1960, the only changes appearing to have been as to type of accounting procedures in the case of cattle. He indicated that at that time they had

file cards that were numbered numerically. He indicates that in his study of the records there were some problems arising in the ownership as it related to identity of the animals. This involved the matter of cattle. Mr. Ingersoll testified that Mr. Jones, the Receiver, worked with him in his accounting work as it related to these services. Mr. Ingersoll on examination indicated that he could project the ownership at least as it related to swine down to the present date and that the continuity of the record insofar as the enterprises were concerned could be projected down to the present date. The testimony seems to indicate that the last projection at the time he was testifying was as of December 31, 1963. (Under the court's Orders, projections have been made down to later dates.) Mr. Ingersoll testified that in all of the balance sheets which he prepared for both Swine Improvement and Fashion Farm the animals involved were treated as being the property of the respective herd owners. He indicated that in his financial reports which he prepared, he showed the transfer of the animals to the various herd owners as sales to the owners and treated both swine and cattle as being actually sold to the various herd owners. He indicated that this was reflected in the income tax returns prepared by him. He testified that there were instances where there is no conflicting ownership cards insofar as cattle records are concerned. The court at this time calls attention to the record as disclosed in the transcript found beginning on line 24, page 115, up to and including line 12, page 128, of Volume 10.

The cross-examination of Robert Ingersoll found in Volume 11 particularly as it relates to the cross-examination by counsel for Home Bank, counsel for Hacking, and counsel for Wells is in itself as it relates to Ingersoll's reply revealing. He indicates conclusively that in some instances, especially that found on pages 1 to 4, ownership can be correctly traced. He does indicate by way of cross-examination that he did not seem to have any question as it related to

ownership until he had begun to reflect upon certain of what he termed guaranty agreements and subsequently admits that this would require legal opinion. Thus it is apparent to the court that his testimony further conclusively indicates that in the general scheme of events the individuals claiming ownership in this cause are in truth and fact the owners. This witness indicates that he can project his accounting in the same method as it has been in the past and can do so up to date and will do so.

The Receiver Don O. Jones, has offered testimony which consumes something over three volumes of this transcript. He states that he came into this enterprise in August of 1962 and was the manager of the liquidating corporations and was subsequently appointed by the court as Receiver in the interpleader actions. He further stated that he was introduced to the matter through the counsel involved with the liquidating corporations, namely, Mr. Mannheimer. It will be remembered that Mr. Mannheimer served as counsel for Mr. Jones up to and at least including the time that Mr. Jones made his first recommendations as to the distribution to be made in this cause on November 8, 1963. Subsequent thereto, and at a later date, he actually ceased to serve as counsel and was appointed a trustee in bankruptcy and is herein adopting and concurring in the recommendations of the Receiver and asking that the funds be turned over to him as Trustee in Bankruptcy. Mr. Jones indicated that not only had he had the help and assistance of Mr. Ingersoll as an accountant, but he had also retained some of the former employees of Fashion Farm, Inc., the most important being Marvin Morris and Maxine Morris. It is apparent all through the testimony of the witness Jones that he regarded the individuals here claiming ownership as owners even up to the time of his report of November 8, 1963. Of course, he does indicate that there was extreme confusion in the record as it relates to tracing individual ownership. It is apparent from his attitude on the witness stand

that he is now and at least since the time of making his last report hostile to the active objectors herein. He candidly states that when he was first employed by Cattle Owners and Swine Improvement that it was the feeling of the people involved in these corporations that there was individual ownership of the livestock. He further states that liquidation commenced on that basis, and that when the petition for interpleader was filed in November of 1962, there was no doubt this was the thought. He seems to indicate that he pretty much entertained this thought until some time in 1963. There are some indications in the record that he had some reservations pertaining to other creditors. As a matter of fact, the record does indicate that either money or property was in some instances distributed to some of the owners with his consent in the very early portions of his connection with the transaction. Throughout his testimony, it is apparent that he is saying that the records are in such a state of confusion that it is impossible for him to actually designate proper ownership of the property. It is apparent from his testimony that insofar as all the other legal claims that are being made as it relates to preference and otherwise, they are not necessarily his conclusions but the conclusions of his counsel. This does not mean that he does not acquiesce and believe that they are proper conclusions as they relate to his recommendations in the report. He does indicate in his testimony that he would be able to, using the past methods of accounting and in accordance with the Court's Orders, make distribution to the owners involved in this proceeding.

It is noteworthy to comment on the testimony of Marvin Morris and Maxine Morris. The testimony of Maxine Morris is that she aided and assisted in maintaining the records. She testifies that she is able to identify the owners pursuant to her records and does not hesitate to say that the records are in most instances accurate. There is no doubt that her testimony and that of Marvin Morris sustain the position of the objectors to this report.

All other witnesses, either by way of deposition or otherwise, indicate clearly and forcefully that the property can be identified, that it has been identified, that the ownership is established and can be established, and that distribution can be made to the rightful owners.

Insofar as further indications as it relates to the testimony in this record except as it appears in further conclusions, it will not be summarized.

The only active participation in the trial of this cause insofar as the Receiver's report is concerned with the exception of the Receiver himself, has been by the Trustees in Bankruptcy in the cases of the bankruptcies of Carroll Morris and Fashion Farm, Inc. The Trustees have adopted the evidence of the receivership and have concurred in the recommendations but have offered no evidence except as they can lay claim to proof submitted by the Receiver in support of his report.

Another small group of claimants as shown in Volume 17, page 1, of the transcript have likewise adopted the Receiver's testimony and cross-examination and concurred in the recommendations of the Receiver. This adoption, as above indicated, is entirely inconsistent with the objections filed by them to the Receiver's first report as of November 8, 1963.

In this cause, the burden of proof has been placed upon the Receiver to sustain and establish the allegations of his report and recommendations made therein. This has been accepted by the Receiver without objection and the report is being submitted upon this basis. This can only mean, according to the prevalent rule everywhere, that it must be sustained by the greater weight of the evidence.

■ Observation of the different instruments relied upon in this cause as it relates to their form and content indicate no ambiguities. No one challenges the forms of the bills of sale or the con-

tracts made. The challenge, if any, is the purport of the use and conduct of these instruments. All instruments are relatively clear on their face insofar as the exhibits in this cause are concerned and the court must accept them as meaning what they say. The recommendation of the Receiver indicates that in certain divisions of their contentions, even though the court were to decide that certain of the property was within the ownership of the claimants involved in these proceedings, yet the court could still find that parts of the property belonged to the bankrupt and should be accounted for in the bankruptcy proceedings and he particularly alludes to milk, offspring, bulls, etc. Of course, the burden of proof to establish these items and the amounts would be upon the Trustees.

In order for the Receiver to succeed in his recommendations in this cause, he must first by a preponderance of the evidence dislodge the contentions of the objectors that they are the owners of the animals here involved. The fact that there may or may not be confusion and difficulty as it relates to identity is of small consequence insofar as the law is concerned. Most assuredly, it may have great impact insofar as distribution is concerned. The court must and without any question in his mind conclude that the Receiver has wholly failed in every aspect of his contention.

The case could end here but the court will explain further. What has already been said would be sufficient to dispose of this case for it shows (1) that the herd owners at all times owned the animals, and (2) that Carroll Morris merely acted as their agent to locate animals to be purchased, to find farmers to manage the animals and to help keep the animals separated and identified, and (3) that the Receiver (stakeholder) and at least one trustee in bankruptcy has heretofore acknowledged and always claimed that the herd owners were the real owners. The second bankruptcy was set up solely so that a claim could be made for the swine.

Mr. Cless, the attorney for the Receiver, in his opening statement said:

"I was employed by the receiver this past spring and after a good deal of thought in reference to the many problems that this record presents, I concluded that these organizations, the corporation and Mr. Morris, were the subject of bankruptcy and that the properties in the hands of the receiver, or the proceeds of the properties, even though they were claimed by investors as investor-owned were in fact at least in part property of the bankrupts that should be administered in that Court. Pursuant to that thinking Carroll Morris was induced to take bankruptcy in this Court and I think was adjudicated June 5, 1964."

The court will now pass to the four contentions made by the Receiver (stakeholder) and the trustees in bankruptcy.

The brief for the Receiver is in four parts. Part I asks the court for a general "turn over" Order pursuant to Title 11, U.S.C., Section 11(a)(21). This section cannot apply as amended to the swine case because the receivership was not instituted within four months of the Carroll Morris d/b/a Swine Improvement Association bankruptcy. The statute says so and the cases say so. In Stevens v. Carolina Scenic Stages, 4 Cir., 208 F.2d 332, 334, the court said:

"Directly in point is the decision of the Court of Appeals of the Third Circuit in In re Distillers Factors Corp., 187 F.2d 685, 687, where that court said: * * * 'This section explicitly prohibits supersession of the possession of such receivers " * * * if the receiver or trustee was appointed * * * more than four months prior to the date of bankruptcy".' "

The 1938 amendment made the four month period mandatory. See Emil v. Hanley, 318 U.S. 515, 63 S.Ct. 687, 87 L.Ed. 954, for the history of the rule.

Section 11(a)(21) does not apply to the cattle case for a number of reasons: (1) The property does not belong to Fashion Farm, Inc. and the Receiver

(stakeholder) is not the bankrupt's assignee. San Diego Wholesale Credit Men's Ass'n v. Garner, 9 Cir., 325 F.2d 862, 866; (2) This interpleader was not superseded by the bankruptcy of Fashion Farm, Inc., Emil v. Hanley, supra; (3) Section 11(a)(21) defines the summary jurisdiction of the bankruptcy court and in this case a summary order could not be issued because the property is not in possession of the bankrupt and it is being held adverse to the bankrupt, Suhl v. Bumb, 9 Cir., 348 F.2d 869.

In Division II of his brief the receiver (stakeholder) gives four theories upon which he asks the court to find a property interest in the bankrupts Fashion Farm and Carroll Morris d/b/a Swine Improvement. Those theories are: (A) Carroll Morris was the bailee of the owners and this relationship gave Morris property rights in the bailed animals as against and in conflict with the property rights of the owners themselves; (B) that the relationship of Carroll Morris to the owners constituted a conditional sale to Morris; (C) that the animals were outrightly sold to Morris; and (D) that the money which the owners gave to Morris to pay for the animals purchased from him did not constitute a purchase but only a loan. The receiver does not claim that Morris d/b/a Swine Improvement or Fashion Farm was the absolute owner of the animals involved but only that Morris and Fashion Farm had an interest in the animals.

The dispute being one between the herd owners and the trustees of Morris and Fashion Farm, the case of San Diego Wholesale Credit Men's Ass'n v. Garner, supra, is squarely in point. It says:

"A trustee in bankruptcy acquires no better title than the bankrupt himself had."

"We see no inequity in permitting the Seller or its assignee (only under the stakeholder's theories are the owners in this case sellers) to retain possession of the proceeds from the sale of property which the Bankrupt had never paid for and title to which had been retained in the Seller until full performance of the terms of the * * agreement."

(Again, the only agreement here to sell to Carroll Morris or Fashion Farm exists in the receiver's misconception of the plain facts.) This case shows that even if the relationships alleged to exist did actually exist, still where Morris and Fashion Farm had no equity in the animals there would be nothing to transfer to bankruptcy. The owners paid the whole purchase price and Morris never paid anything on any alleged re-sale. If the owners only had a lien, the fact that the sale of the animals will not pay in full the alleged lienholders is sufficient in itself to extinguish any alleged lien.

As Miller v. McCray Refrigerator Co., 130 F.2d 873 (8th Cir.), holds, the trustee is entitled only to the equity, if any, in the bankrupts where the lien or reservation of title is valid. As there is no equity in the bankrupts, it is not necessary to discuss the four theories but the court will do so anyway and point out why the facts of this case meet none of the theories.

The clear intent of the parties was that respective owners and purchasers of the cattle and swine were to remain the owners and title holders of them. The evidence of this intent was shown by the testimony of Morris, the detailed inspections by the owners, the attempt by the owners to keep their individual animals identified, the owners mortgaged their animals, the owners depreciated their animals, the contracts showed this intent, and the owners in many instances required the farmers to verify that the herd owners were the actual owners. There was no lease-option agreement because there was no agreement to pay rental payments nor were any payments to substantially equal the purchase price. Allen v. Cohen, 310 F.2d 312 (2nd Cir.). The transaction was not a conditional sale because there was no right in Morris or Fashion Farm to obtain legal title to the animals. Section

60.43, Vol. 4 and Section 70.18(13), p. 1107, Collier on Bankruptcy. As the receiver (stakeholder) points out, an obligation to buy is sometimes a badge indicative of a conditional sale but that is not so as Collier points out where there is no right to purchase and the option is only with the seller.

 A bailee does not from that relationship without more acquire any interest in the bailor's property. Bauldry v. Hall, 8 Cir., 174 F.2d 379, does not so hold. This is not a case where a bailee might have a lien for care or feed on the allegedly bailed property. In any event, as pointed out in the Hacking brief, the only legal relationship which meets the facts is that of agency. Carroll Morris was only the agent of the owners and actually little more than an employee of the large owners. The owners had a right to have their agent buy, sell, and bail out animals for them. The individual farmers were the only bailees in this case.

Bailment and Agency are discussed in Collier, Section 70.18(4) pp. 1083–1090. It states in part:

"An agency is a relationship arising from a contract, express or implied, by which one of the parties confides to the other the transaction or management of some business or other activity in his name, or on his behalf, and whereby the other party assumes so to act and to render an account thereof."

"Consequently, it is well settled that absent state statutory enactment to the contrary, if the property is in a bankrupt's hands as bailee or agent, the trustee holds it as such, and the bailor or principal may recover the property or its proceeds." (Smith Wallace Shoe Co. v. Ternes, 235 F. 282 (8th Cir.); Thomas v. Field-Brundage Co., 215 F. 891 (8th Cir.)

"And delivery to the bankrupt pursuant to an arrangement reserving an option in the owner to sell at some future time vests no property interest in the bailee's trustee if bankruptcy occurs before the option has been exercised." (In re Bowling Green Milling Co., Inc., 6 Cir., 132 F.2d 279.)

"Likewise, an agreement on the part of the agent that he will be liable for losses, for the payment of certain expenses and for insurance, does not change a contract of agency into a contract of sale."

 As to the loan theory, the court only needs to say that the proof is overwhelming that the herd owners purchased the animals and Morris was only a conduit through which the purchases were made.

In Part III, the receiver (stakeholder) claims that 74% of all the dairy cows, 78% of all the heifers, and 52% of all the swine should be turned over to the trustees. This claim, as the receiver says, is based on the assumption that in Part II it was established that the guarantee or repurchase agreements were actually conditional sales contracts, and as a result of the alleged regrouping and confusion on the animals, the herd owners completely lost any lien of security afforded by the conditional sale and reservation of title. The court has found in Part II that the repurchase options were not conditional sales and that the herd owners were the absolute owners, not lienholders, but Part III will be discussed as if the receiver (stakeholder) has established that point.

In any event, the receiver does not say as to whom the lien or reservation of title is claimed to have been lost, that is, whether it is lost as to Morris d/b/a Swine Improvement and Fashion Farm, or lost as to the Trustees in Bankruptcy as representatives of the creditors of the two companies. In Lewis v. Manufacturers Natl. Bank, 364 U.S. 603, 605, 81 S.Ct. 347, 348, 5 L.Ed.2d 323, the court said:

"Prior to 1910 the trustee [in bankruptcy] had no better title to the property than the bankrupt had. (Citations omitted.) The provision with

which we are here concerned (Section 70(c) or 11 U.S.C. 110(c) was written into the law in 1910 to give the trustee all the rights of an ideal judicial lien creditor."

Thus, it is Section 70(c) or (e) which must be used by the trustees if they are claiming that the lien was lost as to creditors.

 The court will first consider whether or not the herd owners lost any lien as to Morris d/b/a Swine Improvement and Fashion Farm, Inc., the bankrupts, keeping in mind that except for Section 70(c) or (e) the trustees in bankruptcy have no better title than the bankrupts had. In Section 78.18 of Vol. 4, Collier on Bankruptcy, the rights that the trustee in bankruptcy has to the equity of the bankrupt in mortgage and conditional sale situations is discussed very completely. It is sufficient to say that it is only the equity which the bankrupt has in the property that the trustee in bankruptcy can recover (except under 70(c) and (e) to be discussed later). San Diego Wholesale Credit Men's Ass'n v. Garner, supra; Miller v. McCray Refrigerator Co., supra; Lewis v. Manufacturers Natl. Bank, supra.

In Part III of his brief, the receiver (stakeholder) makes no attempt to delineate the equity that either of the bankrupts had in the property. Anyway, it is clear that neither of the bankrupts had any interest in the animals, or at least no ascertainable interest. The bankrupts assigned any right they had and thus any equity in the bankrupts would have to be reached under Section 60 or 70(c) which the receiver apparently recognizes and discusses in Part IV of the brief.

The court now considers whether the supposed lien or reservation of title was lost as to the creditors of the bankrupts.

 Lewis v. Manufacturers National Bank, supra, discusses Section 70(c) and its amendments. That Section is inapplicable here for many reasons: (1) "The rights of the creditors * * * to which the trustee succeeds are to be as-certained as of the date of bankruptcy, not at an anterior point of time." No creditor could have acquired a lien by legal or equitable proceedings in the Swine case as of the date the petition in bankruptcy was filed for by then the interpleader had been made permanent. Because of the time factor, 70(c) does not apply at least to the Swine case. The Fashion Farm bankruptcy had been filed approximately a week prior to the date the interpleader was filed. This time factor is a difference between the status of Fashion Farm, Inc. and Swine Improvement under 70(c) but there are other reasons why section 70(c) cannot apply to Fashion Farm, Inc. (2) In determining the rights of any creditor to secure a lien which could have cut off the herd owners' lien and title, one must look to the State law. Vol. 4 Collier on Bankruptcy, Section 70.49, pp. 1417–1418; Aviation Investments, Inc. v. Cameron, 5 Cir., 350 F.2d 959. In Iowa, Sections 556.3 and 556.4 are the only statutes which could possibly give the creditors any rights as against the liens and title of the herd owners and these sections are not applicable because the bankrupts never had possession of the animals. For this reason, Section 70(c) is applicable to neither the swine or cattle cases. (3) There is no common law exception to Sections 556.3 or 556.4 applicable to this case. The regrouping theory is part of the broader concept sometimes referred to as "conceptual repugnancy," that is, allowing the bankrupts to use the property in a manner inconsistent with retention of title or a lien. Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, is the landmark case. See also Solomon v. Northwestern State Bank, 327 F.2d 720 (8th Cir.). It is in this regard that the stakeholder relies by citing 78 C.J.S. Sales § 595c. Whether or not this rule ever applied in situations wherein the debtor or bankrupt did not retain possession, it is clear that a retention of possession has always been required in Iowa. See King v. Wallace, 78 Iowa 221, 42 N.W. 776; Wilson v. Kelso, 250 Iowa 67,

92 N.W.2d 392, 395. These cases discuss the purpose of Section 556.3 and 556.4. Although no case is squarely in point, the court concludes that at least under the regrouping theory, the trustees would have to bring themselves within Section 556.3 or 556.4 which they cannot do because Morris d/b/a Swine Improvement and Fashion Farm did not have possession of the animals. The court does not find that there was any use inconsistent with the reservation of title or lien, but rather merely concludes that the same would be of no avail absent possession by the bankrupts as of the date of bankruptcy. (4) It is not even contended that Fashion Farm, Inc. and Morris d/b/a Swine Improvement and the trustees are entitled to a forfeiture at the expense of the herd owners. Uniform Commercial Code, Section 9–315, attempts to change the forfeiture rule but it does not apply here. The rule possibly applicable to the present case is set out in 1 Am.Jur.2d, p. 291. In 1 Am.Jur.2d, Section 19, p. 288, the rule says:

> "The general rule is that when goods of the same kind owned by different persons are, with mutual consent of the owners, mixed and intermingled so that portions or shares of the various owners are indistinguishable, the owners become tenants in common of the mixture, each having an interest in common in proportion to his respective share."

Thus, if there was a commingling, the property was not lost to the trustees in bankruptcy but rather it only means a pro rata distribution. This means only that portions of the property may have to be distributed pro rata to the herd owners as the confusion, if any, was only among the herd owners. It cannot mean that they should suffer any forfeiture to the bankrupts or their trustees. (5) The receiver (stakeholder) in asking for the Fashion Farm and Morris d/b/a Swine Improvement shares says:

> "Thus, Morris cannot be charged with fraud, or even negligence, and under the record in this case it is quite pos-

sible that it could be considered that the confusion resulted under the first point in the Thompson decision ([In re Thompson] 164 Iowa 20 [145 N.W. 76]), '(1) where the mixture is made by consent of parties.'"

Of course, no one claims that Morris or Fashion Farm was at any time guilty of any fraud or negligence, and if they had an interest in the cattle or swine, such pro rata share would be set off to the trustees. But, they have no share, and if they did, it was transferred before bankruptcy and must be sought under Section 70(e) and Section 60. (6) Last but not least, the receiver (stakeholder) has not shown that the herd owners had only a lien or reservation of title instead of absolute ownership. In other words, no conditional sale, absolute sale with mortgage back, or lease-purchase agreement has been proven and any contention that such an agreement existed is clearly against the undisputed evidence and the intent of the parties involved.

The court has now determined that there was no merit in the first three divisions or parts of the receiver's brief and these conclusions can be and are arrived at on the basis of the undisputed facts in this case. It was not necessary in discussing the first three parts of the receiver's brief to resolve any questions of disputed proofs. However, Part IV of the receiver's brief does necessitate resolving at least one issue wherein the proof is disputed, that is, whether or not the transfers by Morris d/b/a Swine Improvement and Fashion Farm, Inc. were paper transfers or whether or not some ascertainable property was actually transferred.

The receiver argues Part IV under three separate statutes. (1) Section 70(e)(1) is an alternative remedy to Section 60. Section 70(e)(1) allows the trustee to avoid any transfers by asserting that the transfer was fraudulent or fraudulent in law as to any creditor. Whether the transfer was fraudulent or fraudulent in law is controlled by the local state law. Wilkinson v. Livingston,

45 F.2d 465 (8th Cir.); Sieg v. Greene, 225 F. 955 (8th Cir.).

Of course, there was no fraud in this case or at any stage in the history of Fashion Farm, Inc. and Swine Improvement Association. The receiver (stakeholder) states in his brief: "Now Morris was not engaged in a willful fraud." "Thus, Morris cannot be charged with fraud or even negligence." The elements of fraud in Iowa are misrepresentation, falsity, materiality, scienter, intent to deceive, reliance, and resulting injury. Phoenix v. Stevens, 256 Iowa 432, 127 N.W.2d 640. There is not a scintilla of evidence of any of these elements in this case. As stated in the Wells brief: "To attempt to place there herd owners in a position of conspiring with Carroll Morris to defraud certain creditors of Morris is preposterous on the face of it."

The court also finds that there was no constructive fraud in this case. To find constructive fraud, it is necessary that there was something actually tranferred, that it was not a preference (that is, not given to an existing creditor to satisfy a debt in part or in whole), and that the transferror was not solvent.

As the receiver (stakeholder) is forced to concede, this theory can only concern itself with property of which Fashion Farm, Inc. or Morris d/b/a Swine Improvement had absolute ownership of prior to the alleged assignment in August of 1962. Thus, the court here can only be concerned with the animals, if any, which were actually then in existence in August 1962 and which were absolutely owned by Fashion Form, Inc. or Morris d/b/a Swine Improvement.

The court cannot be concerned with any calves which came into existence subsequent to August 1962 unless it can be clearly established that the same came from the transferred animals which Fashion Farm, Inc. and Morris d/b/a Swine Improvement owned absolutely prior to August 1962 and which were transferred. Neither the receiver nor the trustees have established that there are any such animals. They are forced to concede that Mr. Ingersoll never attempted to establish an animal accountability record in cattle and that the existing records only indicate the status of the cattle as of the day that the receiver (stakeholder) sold them. The long and the short of it is that the receiver in effect is admitting that he does not have an iota of evidence that even one cow or calf or bull or one dollar of milk money absolutely owned by Fashion Farm, Inc. was transferred in August of 1962. These were only paper transfers.

The transfers, if anything was transferred, were preferences. They were given to existing creditors, the herd owners. The receiver complains that these owners still have claims filed in the bankruptcy cases. Of course, the transfers did not satisfy all of the debts owed and this is because these transfers actually involved little or no animals. But to the extent that these were transfers, they would decrease the debt owed the owners. The court concludes that the transfers, if any, were valid preferences.

The receiver also has not shown that anything was transferred. This has already been demonstrated with cattle. The same is true with swine. The receiver (stakeholder) is under the misconception that the bankrupts are entitled to half the offspring since 1962. This is, of course, incorrect. The most they could claim is offspring that were transferred and possibly an interest in the production of these offspring, but no such animals are shown to exist. The court doubts any such animals ever existed.

(2) The Bulk Sales Act does not apply to farmers. 20 Iowa Law Review 815, 823; Spurr v. Travis, 145 Mich. 721, 108 N.W. 1090; Wilson v. Edwards, 32 Pa.Super. at 295; Schultz, Baujan & Co. v. Bell, 23 Tenn.App. 258, 130 S.W.2d 149, 152, 168 A.L.R. 758. The court concludes that the Iowa Court would not apply the Act to farmers. Also, the re-

ceiver has not proven that the facts of the case come within the Bulk Sales law.

(3) It is alleged that the bankrupts assigned all their right, title and interest in milk income, calves and bulls to the owners and the receiver and that such transfers are void as to the trustees under Section 60 of the Bankruptcy Act (11 U.S.C. § 96) as voidable preferences.

The receiver (stakeholder) does not contend that the trustees can claim voidable preferences in the swine case because there the alleged transfers took place many months more than four prior to the date Morris d/b/a Swine Improvement filed bankruptcy. Thus the claimed applicability of Section 60 is limited to the Fashion Farm or cattle case as it is called.

██ ██ The portion of Section 60 applicable here states:

"A preference is a transfer * * * (1) of any of the property of a debtor (in this case Fashion Farm, Inc.) (2) to or for the benefit of a creditor (3) for or on account of an antecedent debt (4) made or suffered by such debtor while insolvent and * * * (5) the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class."

It was incumbent upon the trustees to prove each of the above five enumerated elements, none of which were in fact proven.

Voluminous briefs and arguments have been presented to the court by interested parties to this litigation. The court has not and will not attempt to analyze every theory and proposition submitted. The length of the decision in this matter would be without end. Ownership has been determined and what has been said as it relates to the theories offered is deemed by the court to be sufficient in the disposition of this case.

The legal theories and arguments of the Receiver here are ingenious and if they could be sustained by evidentiary support of greater weight, the court might be able to give to them more consideration. Under the record in this case, the court cannot conclude from the evidence under sound principles of law that there are any property interests whatsoever remaining in the bankrupts that would occasion a transfer to the Trustees. Throughout these proceedings, the Receiver has advanced the theory that bankruptcy action could more fairly deal with the financial chaos involved. It seems that the theory here is that the legal machinery of bankruptcy could more properly cope with the marshalling of assets. Even if this were so (for which the court has grave doubts), the problem of ownership would of necessity be exploited and the court either here or on bankruptcy review would have to ultimately determine the matter of ownership. The case has been exhaustively tried and its problems insofar as possible should be put at rest.

A final decree will be entered in these proceedings rejecting the recommendations of the Receiver as set forth in his Report and Recommendation and the amendment thereto. In addition, there will be a final adjudication of ownership of the cattle and swine and proceeds thereof in those individual owners involved in the interpleader action. Further, a decree shall enter denying ownership of cattle, swine, or proceeds on the part of Fashion Farm, Inc., Carroll Morris, Carroll Morris d/b/a Swine Improvement Association, or their respective trustees in bankruptcy.

In order to make a determination of distribution, the court will pursue a ruling under and by virtue of Rule 54(b) indicating that there is no just reason for delay and direct entry of final judgment against the Trustees and the Receiver's recommendations.

It will be hereafter ordered and adjudged that no animals or proceeds therefrom are to be transferred to the Trustees in Bankruptcy. It will further be ordered and decreed that the mortgagees'

and lien holders' rights established in this cause shall be protected.

The court is ever mindful that the objectors have spent considerable time in the establishment of identity of the property. The distribution of the property now in the hands of the Receiver does contain problems relating to proper distribution. The problem in swine perhaps is not as problematical as that dealing with cattle. Under the court's direction, projected reports have been filed by the Receiver in the cattle account and in the swine account as of January 20, 1966, in both cases and are special reports up to and including December 31, 1965. It is apparent that all property by way of live animals has been liquidated. It is apparent that the accounts are now ready for distribution either in cash, notes, or other forms of assets. There are those of the objectors who would agree that though there may be some corrections that the exhibit bearing identification T–76–C would provide a practical base for determination of distribution in the cattle case, and that likewise, the accountant could extend exhibit T–81–S as it relates to swine. There is some indication on the part of other objectors that perhaps pro rata distribution could be properly pursued in certain instances. It could well be that it will be necessary to have a combination of the two. There has been every indication to the court from those who actively participated in the trial of the case that, in general, an amicable order of distribution could possibly be reached as between the parties involved in the interpleader. The Receiver and his accountant have assured the court in their testimony that they can make projections from the records they have in a manner such as have been made heretofore and that they will insofar as possible in their proposed distribution follow the orders and directions of the court.

This Memorandum constitutes the findings of fact, conclusions of law and Order for judgment pursuant to Rule 52(a), Title 28.